**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EDWARD MONROE, et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | **NO. 05-04937** |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY A. BEARD, et al.,** | : | |
| **Defendants.** | : | |

**MEMORANDUM AND ORDER**

Stengel, J.                                                     **August 16, 2007**

        Fourteen current or former inmates of the State Correctional Institution at

Graterford, Pennsylvania brought this suit *pro se*[1] alleging violations of their federal

constitutional rights when defendants searched their cells and seized legal materials on

August 4, 2005.  Both parties have moved for summary judgment.  For the reasons

detailed below, I will grant defendants' motion for summary judgment.

I.      BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

        A.    Commercial Law Schemes and Redemption Theory.. . . . . . . . . . . . . . . -4-

        B.    Commercial Law Schemes in Pennsylvania Prisons.. . . . . . . . . . . . . . . -7-

        C.    August 4, 2005 Search for UCC materials.. . . . . . . . . . . . . . . . . . . . . . -9-

        D.    DOC Handling of Plaintiffs' Material After the Search. . . . . . . . . . . . . -9-

_____

        [1] The court unsuccessfully attempted to appoint counsel for plaintiffs on three occasions and plaintiffs
proceeded *pro se*.  Plaintiffs were represented by counsel at the settlement conference held at SCI-Graterford on
September 8, 2006.  See I.F. *infra*.

E.      Grievance Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

      (1)   Davon Collins. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-

      (2)   Alexander Davis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-

      (3)   Maurice Everett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

      (4)   Robert Royster. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

      (5)   Anthony Dickerson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

      (6)   Gregory Stover. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

      (7)   Richard Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

      (8)   Lawrence Belser. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

      (9)   Edward Monroe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

      (10)  Howard Gibson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

      (11)  Charles Poulson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

      (12)  Sylvester Perry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

      (13)  Sean Williams. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

      (14)  Salim Hickman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

F.      Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

II.     STANDARD FOR A MOTION FOR SUMMARY JUDGMENT. . . . . . . . . . -24-

III.    DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

A.      Exhaustion of Administrative Remedies. . . . . . . . . . . . . . . . . . . . . . . . . -27-

      B.      Fourteenth Amendment Procedural Due Process Claim . . . . . . . -31-

C.      First Amendment Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

      (1)      Rational Relationship. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

      (2)      Alternative Means for Plaintiffs to Exercise Right. . . . . . . . . . -42-

      (3)      Burden on Prison to Accommodate Right. . . . . . . . . . . . . . . . . -45-

      (4)      Alternatives to the Regulation. . . . . . . . . . . . . . . . . . . . . . . . . . -45-

D.      Damage Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -47-


IV.      CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -49-

I.      **BACKGROUND**

On August 4, 2005, Edward Monroe, Davon Collins, Alexander Davis, Maurice Everett, Robert Royster, Gregory Stover, Richard Johnson, Lawrence Belser, Anthony Dickerson, Howard Gibson, Charles Poulson, Sylvester Perry, Sean Williams, Wendell Green,[2] and Salim Hickman (collectively "plaintiffs") were serving prison sentences imposed by Pennsylvania courts at the State Correctional Institute at Graterford, Pennsylvania ("SCI-Graterford") after they had been convicted of crimes.  See Defs' Am. Mot. Dismiss, App. I.  Prison policies state that inmates cannot possess contraband and

---

[2] The court granted Mr. Green's request to dismiss his claims on May 22, 2007 and he is no longer a plaintiff in this action.

that staff can search inmates' cells and persons at any time to seize contraband. The prison defines contraband as property inmates are not permitted to possess that presents a threat to others or to the security of the prison.

### A.      Commercial Law Schemes and Redemption Theory

In mid-2004, William Fairall, Deputy Chief Counsel for the Department of Corrections, became aware that individuals who had been charged with or convicted of crimes were filing bogus liens and judgments to harass and threaten those who were prosecuting or holding them.[3]  Fairall learned about a case in New Jersey where criminal defendants registered a 14.5 million dollar lien against a federal prosecutor and a 3.5 million dollar lien against a federal judge.  See Defs' Am. Mot. Dismiss, App. II, Decl. Fairall, Ex. A, John Shiffman, Defendants go on the offensive, Philadelphia Inquirer, June 6, 2004, at B-1.  In that case, the defendants billed judges, prosecutors, and defense lawyers for using their names in court papers and hearings.  Defendants claimed that they had a trademark interest in their names and that court personnel owed them 1 million dollars for each use.  At first the judges and lawyers ignored these demands–until defendants filed million dollar liens and lawsuits to collect the alleged "debt."  It took a court order to remove the liens.  Defendants targeted Stephen Orlofsky, a former federal judge, with one of the liens.  Orlofsky commented that the experience of clearing his

---

[3] These schemes are not unique to this region.  In support of their motion, defendants have collected fifteen criminal cases involving the prosecution of individuals who have perpetrated similar schemes.  See Defs' Am. Mot. Dismiss, App. IV.

name was "maddening" and said "you can't get intimidated by it or be baited into saying something you shouldn't say.  That's exactly what they want."  Id.  Authorities involved labeled the defendants' attack "paper terrorism."

Fairall spoke with Assistant U.S. Attorney Stephen Stigall in August or September 2004 about the situation.  Stigall, who was a target of the scheme described above, encouraged Fairall to take action to prevent bogus liens and judgments from being filed.  Fairall learned that the Uniform Commercial Code ("UCC") makes filing a financial statement with the Department of State relatively easy in order to facilitate legitimate commercial transactions.  However, it is very difficult and expensive for a victim of a fraudulent financing statement to have the statement expunged and expungement does not correct damage to an individual's credit report.

During the same time period, Lieutenant John Moyer, who works in the Internal Security Office at the SCI-Graterford, learned that inmates at the prison possessed materials similar to those that had been utilized by the criminal defendants in New Jersey who filed bogus liens.  Specifically, inmates in Pennsylvania Department of Corrections prisons ("DOC") had UCC materials, particularly materials related to filing financing statements or liens under Article 9 of the UCC, and information on copyrighting their names.  The financing statements were accessible on forms and easy to file.

Inmates also possessed instruction books such as Cracking the Code, which claim the government has no power over people who chose to ignore them and encourages

individuals to flout and intimidate authority.  This book instructs its readers on the

"redemption" theory.  "Redemption" is an anti-government scheme that utilizes

commercial law to harass and terrorize its targets.  It is increasingly popular among prison

populations.  This theory advocates that an individual can "redeem" himself through the

filing of commercial documents.  According to the theory, the convict has a split

personality: a real person and a fictional person called a "strawman."  The strawman came

into being when the United States went off the gold standard in 1933 and pledged its

citizens as collateral for its national debt.  Proponents of the theory believe that the

government only has power over the strawman and not the real person.  The real person,

however, can "redeem" the fictional person by filing a UCC financing statement.  This

allows the real person to acquire an interest in the fictional person that trumps the

government's power.  Redemption theorists believe that the government must pay the real

persons millions of dollars to use the strawman's name or keep him in custody.  If the

official refuses to pay, the real person can file a lien.  The official is encouraged to release

the convict from custody to avoid this situation.  Cracking the Code acts as an instruction

manual and encourages readers to file the sample forms provided.

While filers of the liens assert that they are entitled to the debt because the public

official targeted has wronged the filer through criminal prosecution or by using his name,

these schemes are fraudulent because the liens against public officials are not supported

by real debts or security interests as required under Pennsylvania law.  See 13 PA. CONS.

STAT. ANN. §§ 9203, 9509.  An individual does not have a copyright in his own name.

See 17 U.S.C. § 102 (stating that copyrights are only available for original works of

authorship such as literary, musical, or pictorial works).  Public officials do not owe debts

for investigating and prosecuting crimes.  Federal authorities have successfully

prosecuted perpetrators of these schemes under various criminal statutes.  See nt. 3 *supra.*

### B.    Commercial Law Schemes in Pennsylvania Prisons

In March 2005, a Pennsylvania inmate filed UCC financing statements against

Secretary of Corrections Jeffrey Beard, a defendant in this case, and a prison

superintendent because they used the inmate's "copyrighted" name.  In September 2005,

the inmate threatened to file additional liens against DOC officials unless they released

him from prison.  The inmate predicated that "[s]oon the D.O.C. will have 100's of people

filing.  It's coming and it can't be stopped."  Defs' Am. Mot. Dismiss, App. II, Decl.

Fairall, Ex. C.

The DOC took several actions in response to this threat against its staff.  On July

20, 2005, it informed its institutions by memorandum that "[a]ny publications received at

your facility that advocate and assist in the UCC redemption process should be reviewed

by the facility Publication Review Committee.  The UCC redemption publications, UCC

forms, and tax forms that inmates use to file fraudulent documents, including bogus UCC

liens...[are] considered contraband and should be confiscated."[4]  See Defs' Mot. Summ.

J., App. V,  Second Decl. Fairall, July 20, 2005 Memorandum from John Shaffer re:

Interception of UCC Related Contraband.  The memo informed staff that inmates have

been using the UCC to file fraudulent liens against DOC staff and that other inmates have

been charging fellow inmates fees up to $1,500 to start the UCC redemption process.  The

DOC announced its ban on certain publications as violating the prison's policy on inmate

mail privilege, DC-ADM 803, which prohibits "[w]ritings that advocate, assist or are

evidence of criminal activity or facility misconduct," as well as violating prison policies

that prohibit prisoners from engaging in business while incarcerated.  Id.  The memo

instructs staff to "investigate inmates whom you believe may be engaged in any of the

various stages of copyrighting their names by publication in a newspaper of general

circulation or filing UCC liens."  Id.  However, material should not be destroyed until

inmates had an opportunity to object using an "Unacceptable Correspondence Form" to

show that he or she had the right to use such material based on legitimate business or

financial interests.

In July 2005, Moyer, who had been investigating UCC materials in monitored mail

since June 2004, began tracking which inmates were receiving this material.  Moyer

_____

[4] The DOC did not specifically prohibit UCC materials prior to the August 2005 search.  An August 30, 2005 amendment to DC-ADM 803, effective September 6, 2005, authorized DOC employees to confiscate UCC filing documents material from inmates.  The inmate would then have ten days to advise the prison of the legal basis and purpose of his or her possession of the material  Moyer and Deputy Superintendent Lorenzo decided not to issue misconduct charges to any plaintiffs who possessed contraband UCC materials during the August 4, 2005 search because inmates had not been specifically informed that the material was contraband.

noticed that these inmates added distinctive symbols and words to their signatures and received a publication called <u>The American's Bulletin</u>.  Moyer kept a list of inmates who appeared to be involved in these schemes but did not seize their mail or issue misconducts.

**C.     August 4, 2005 Search for UCC materials.**

On August 4, 2005, Moyer instructed a group of corrections officers to search the cells of the inmates on his list whom Moyer suspected to be in possession of UCC redemption materials.  He instructed the searching officers what to look for and gave the officers a list and packet of samples to help them identify what to seize.  He ordered the officers to conduct a visual strip search of inmates before the searches and then handcuff them for safety reasons.  He also told the officers to issue a Confiscated Items Receipt for the seized material.  He instructed the searching officers to place the seized materials in evidence bags or property boxes and bring the material back to the Control Center.

On August 4, 2005, corrections officers searched the plaintiffs' cells and seized documents.  Prison officials conducted the searches in the following manner: officers entered the cells, strip searched plaintiffs inside the cells, ordered plaintiffs to re-dress, then handcuffed them and had them stand outside the cells while the officers searched the cells.  Defendants also seized some typewriters and word processors during the search; these have all been returned to the inmates from whom they were taken.

**D.     DOC Handling of Plaintiffs' Material After the Search**

After the search and seizure, the officers brought the seized material back to the Internal Security Office.  In the Internal Security Office, Moyer and Lieutenant Owens placed the confiscated material from each individual inmate into its own box.  Owens made a record of the number of boxes per inmate.  Moyer reviewed the materials to see if any of it could be returned to the inmates.  In October and November of 2005, Moyer met with the inmates and offered them the material he deemed returnable.  Defendants did not condition return of the material with a demand that plaintiffs give up any claims in this lawsuit, which they had already filed.  Moyer offered to return materials to plaintiffs Belser, Collins, Dickerson, Everett, Gibson, Green, Hickman, Monroe, Perry, Poulson, and Williams.  Perry and Hickman[5] accepted the offers but the others refused.  Davis,[6] Johnson, Royster,[7] and Stover had no legitimate material to be returned.  In early 2006, after Moyer had completed his reviews and meetings, Moyer sealed the boxes and padlocked them in an unused cell block until July 2006.

In July 2006, Moyer brought the boxes back to the Internal Security Office where he reviewed the documents with defendants' legal counsel and made a list of documents they were willing to return to each inmate and documents they were not willing to return.  Defs' Mot. Summ. J., App. V, Third Moyer Decl., Ex. D. for copies of lists sent to

---

[5] Hickman accepted all returnable materials on November 9, 2005.

[6] The inventory list notes that Davis had some returnable materials.  <u>See</u> Defs' Mot. Summ. J., App. V, Third Moyer Decl., Ex. D.

[7] Royster had "various small papers with handwritten names and addresses" that were returnable.  <u>See</u> Defs' Mot. Summ. J.  Third Moyer Decl. App. V, Ex. D.

plaintiffs. The lists were sent to plaintiffs with invitations to review all of the materials and take back the items defendants had agreed to return.

In August 2006, Moyer called all the plaintiff inmates to the Internal Security Office and presented them with the material that had been taken from their cells on August 4, 2005 and offered to let each inmate review all his material and to take back the items defendants had decided were returnable.  Moyer offered to return materials to Belser, Collins, Davis, Dickerson, Everett, Gibson, Monroe, Perry, Poulson and Royster. Once again, defendants did not request that the plaintiffs give up any claims in exchange for the material.  All of the inmates refused to take material that was offered back.  While Hickman, Johnson, Monroe, and Royster did review the materials, Belser, Collins, Davis, Dickerson, Everett, Gibson, Perry, Poulson, and Stover refused to review any of the materials presented.

In September and October 2006, Moyer and two other Internal Security officers supervised an additional review of the material by plaintiffs Belser, Collins, Davis, Dickerson, Everett, Gibson, Perry, Poulson, and Stover per court order.[8]  Plaintiffs

_____

[8]  On September 8, 2007, the court asked Magistrate Judge Thomas Rueter to hold a settlement conference at SCI-Graterford.  Judge Rueter also met separately with plaintiffs who were no longer incarcerated.  After the settlement discussions proved unproductive, Judge Rueter ordered on September 13, 2006 that "Defendants shall provide those plaintiffs so agreeing an opportunity to review the documents seized from their cells relevant to this civil action. The defendants shall arrange for plaintiffs to review the documents in accordance with this Order by October 13, 2006. Plaintiffs may retain those documents not determined by prison officials to be contraband.  After reviewing the documents, each plaintiff shall compile a list of documents he contends were seized from his cell but are missing from the documents produced by defendants. Plaintiffs shall compile and mail their lists of missing documents to John  O.J. Shellenberger, Chief Deputy Attorney General, 21 South 12th Street, 3rd Floor, Philadelphia, PA 19107, by November 13, 2006.  Defendants shall respond in writing to each plaintiff regarding the status of the alleged missing documents by December 13, 2006." (Document No. 61).

Dickerson and Everett again refused to review the materials.  Again, defendants offered to return the materials that they had deemed returnable without conditioning the offer on plaintiffs giving up any of their claims.  Once again, plaintiffs refused this offer.  On September 21, 2006, Moyer presented plaintiffs Green and Williams with their material in Judge Rueter's courtroom since they were no longer incarcerated.  Both reviewed the materials.  Green took some of the offered materials back but Williams refused to take any.

Defendants assert that all of the material taken from plaintiff's cells on August 4, 2005 has been safely and securely stored under the auspices of the Internal Security Office since that date.  Defs' Am. Mot. Dismiss. App. II, Second Moyer Decl. ¶ 11.  None of it has been destroyed, discarded, damaged, or removed from SCI-Graterford.  Id.  Plaintiffs allege in their cross motion for summary judgment that several correctional officers informed them that defendants were shredding, throwing away, and keeping their seized personal material for their own use.  See Pls' Cross Mot. Summ. J. ¶ 19.  Plaintiffs do not disclose the names of these correction officer witnesses.

### E.    Grievance Procedure

Defendants did not give plaintiffs a pre-deprivation hearing or notice before taking their property.  On August 10, 2005, plaintiffs received a memorandum from Deputy Superintendent Lorenzo ("August 10th Memorandum"), which stated that the reason for the search and seizure was to retrieve documents associated with the UCC.  The memo

stated that the Internal Security Department believed that some inmates, including the

plaintiffs, were using the UCC to file fraudulent liens against Department of Corrections

staff.   Therefore, the prison had confiscated publications and forms used to prepare and

file fraudulent liens because these materials were contraband.   The memorandum

instructed inmates that "[a]ll property pertaining to this investigation will remain in the

custody of the Internal Security Department pending review and disposition of the

investigation.   In the interim if [sic] any legal documents that were unwittingly

confiscated and are not related to the UCC investigation will be returned to you."  Pls'

Mot. Summ. J. Ex. E.  Inmates could object to the search and seizure by using the

attached "Unacceptable Correspondence Form" or the DC-154A "Confiscated Items

Receipt" to show they had a right to the seized material based on legitimate business or

financial interests.   The memorandum stated that the DOC's Chief Counsel would review

these forms and if the Chief Counsel denied the appeal, inmates could file a grievance

before the facility destroyed or disposed of the contraband.   The memo concludes that

"[u]pon completion of this investigation you will be notified as to the outcome."   Id.

Some plaintiffs filed grievances and appeals from the denial of their grievances as

outlined below.   Plaintiffs also allege that they did not file grievances because they tried

to follow the grievance procedure outlined in the August 10th Memorandum.   According

to plaintiffs, the August 10th Memorandum advised plaintiffs that they could not file a

grievance until after the DOC's Chief Counsel's Office denied their objections to the

seizure on the Unacceptable Correspondence form.  In support of their position, plaintiffs aver that their initial grievances were returned by Grievance Coordinator Wendy Moyer with a copy of the August 10th Memorandum and instructions to fill out the Unacceptable Correspondence Form.  Some plaintiffs filled out the Unacceptable Correspondence Form but never received a response.  Defendants never informed plaintiffs that the investigation was complete.

According to the records submitted with defendants' motion for summary judgment, defendants have received the following grievances and appeals from plaintiffs. Plaintiffs contest the accuracy of these records and assert that they exhausted their administrative remedies.  However, plaintiffs do not supplement defendants' records with their own copies of submitted grievances.

**(1)   Davon Collins**

Collins filed a grievance on August 5, 2005 (Grievance No. 126180) regarding the search.  On August 16, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  On October 13, 2005, Collins sent a letter stating that he had appealed to the Office of Grievances and Appeals but had received no response.  The Office had received no appeal and on October 14, 2005 the Office told Collins to contact the Superintendent's office to ensure that they had received his appeal.  Collins submitted no further appeals.

**(2)   Alexander Davis**

On August 5, 2005, Davis filed a grievance (Grievance No. 126009) regarding the search.  On August 16, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  On October 24, 2005, the Superintendent received Davis' appeal, which he denied on November 14, 2005.  On November 17, 2005, the Office of Grievances and Appeals received an appeal which did not include copies of the initial grievance, initial review, and the appeal to the facility manager and the facility manager's decision.  The Office informed Davis on November 21, 2005 that his appeal would not be considered until he submitted these documents within ten working days, which Davis did not provide.  Davis also submitted an Unacceptable Correspondence Form on August 18, 2005.

### (3)   Maurice Everett

On August 7, 2005, Everett submitted a grievance (Grievance No. 126182) related to the search.  Everett corrected this grievance on August 10, 2005.  On August 12, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  On October 24, 2005, the Superintendent received a request slip from Everett inquiring into an appeal he had submitted.  The Superintendent's Office responded that it had not received an appeal.  On November 3, 2005, the Office of Grievances and Appeals received a letter from Everett asking it to review his grievance. The Office responded that it could not consider the appeal without review by the Superintendent and encouraged Everett to respond to contact the Superintendent's Office

to ensure they have received his appeal.  Everett also objected to the search by filling out an Unacceptable Correspondence Form on August 17, 2005.

### (4)   Robert Royster

On August 9, 2005, Royster submitted a grievance (Grievance No. 126094) complaining of the August 4, 2005 search and seizure of his legal materials.  On August 15, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  Royster appealed this initial response on August 19 and 25, 2005.  David DiGuglielmo responded to and upheld the grievance on September 6, 2006.  Royster appealed this decision on September 9, 2005.  The Office of Grievances and Appeals received the appeal on September 14, 2005 and upheld the decision on November 10, 2005.  While Royster exhausted his administrative appeals, he did not do so before commencing this action.

### (5)   Anthony Dickerson

On August 5, 2005, Dickerson submitted a grievance (Grievance No. 126006) related to the search.  On August 12, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  On October 19, 2005, Dickerson submitted a request to respond to his appeal.  Dickerson wrote that this was the second time he had submitted an appeal and that he was sending an appeal to exhaust administrative remedies due to the filing of this lawsuit.  Dickerson also submitted a grievance appeal dated August 25, 2005, but received by the Superintendant's

office on October 24, 2005.  On November 1, 2005, the Superintendent returned this grievance for failure to follow DOC policy because Dickerson's name and DOC number does not appear on the appeal.  The Superintendent stated that Dickerson had previously been instructed to resubmit his appeal and since he had not done so, his appeal at this point was untimely.  Dickerson also submitted an appeal to the Office of Grievances and Appeals.  On November 15, 2005, the Office responded that it could not consider the appeal because the grievance had not been reviewed by the Superintendent.

### (6)     Gregory Stover

Stover did not submit any grievance regarding the August 4, 2005 search.

### (7)     Richard Johnson

On August 5, 2005, Johnson submitted a grievance (Grievance No. 126005) related to the search.  On August 12, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  On September 26, 2005, Johnson sent a request inquiring into a response to his appeal of his grievance.  Johnson stated that he had been advised that he would receive notice of a completed investigation.  Johnson resubmitted his appeal upon the request of the Grievance Coordinator, which was received on October 25, 2005.  On November 14, 2005, the Superintendent upheld the initial denial because the material confiscated was UCC related. Johnson did not lodge any further appeals.  Johnson also objected to the search by filling out an Unacceptable Correspondence Form on August 16, 2005.

(8)     **Lawrence Belser**

Belser did not submit any grievance regarding the August 4, 2005 search.  Belser did fill out the Unacceptable Correspondence Form on August 18, 2005 protesting the search and seizure.  Attached to the Unacceptable Correspondence Form Belser attached a handwritten two page document titled "Actual and Constructive Notice for Redress of Grievance."  On August 18, 2005, Grievance Coordinator Wendy Moyer rejected the grievance because it was not legible, understandable, or written in a courteous manner.

(9)     **Edward Monroe**

On August 16, 2005, Monroe submitted a grievance (Grievance No. 126995) concerning the August search.  On August 18, 2005, Monroe resubmitted the grievance because the initial grievance was too long.  On August 24, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  On December 19, 2005, the Office of Grievances and Appeals received a letter from Monroe regarding his grievance.  The Office responded that it did not have a record of receipt of an appeal from Monroe.  Since Monroe did not appeal his denial to the Superintendent, the Office could not have considered his appeal anyway.  Monroe also objected to the search by filling out an Unacceptable Correspondence Form on August 19, 2005.

On November 3, 2005, Monroe submitted a second grievance (Grievance No. 135670), which was denied as unintelligible.  The grievance alleged that Monroe had

suffered harm from contraband sold at the commissary.  Monroe resubmitted this grievance on November 18, 2005, which complained that while the DOC had labeled the UCC contraband, the UCC was still available at the library.  The grievance officer denied Monroe's grievance on December 7, 2005 and stated that the UCC materials that had been seized by Monroe were not available in the library.  On December 7, 2005, Monroe sent correspondence to Wendy Moyer, the grievance coordinator, complaining that Captain Dohman was an unfair decision maker because he had a connection to Monroe's grievance.  A note on Moyer's correspondence states that Monroe will have to lodge a formal appeal, which he did not.

### (10)   Howard Gibson

On October 1, 2005, Gibson submitted a grievance (Grievance No. 131330) concerning the search.  On October 3, 2005, the Grievance Coordinator rejected Gibson's grievance as untimely because it had not been submitted within 15 working days of the events complained about as required by DC-ADM 804 VI.A.8.  On November 5, 2005, the Superintendent received an appeal form from Gibson concerning the rejection of his grievance.  Gibson alleged that he submitted an official challenge to the seizure of his material on August 5.  Since the Unacceptable Correspondence form only contained a couple of lines for Gibson to contest the seizure, Gibson drafted his challenge on a separate piece of paper.  Gibson noted that according to the August 10 Memorandum, he would be notified when the institution had made a decision regarding whether his

materials were contraband.  Gibson had assumed that the prison received his "challenge"
and was considering it as part of its investigation.  Gibson had waited patiently for the
investigation to conclude.  When this did not happen, he filed a grievance to resolve the
matter.  Gibson found it incredulous that the administration would tell him that his
grievance was untimely after he followed the steps he had been directed to take.  On
November 4, 2005, the Superintendent upheld the rejection of the grievance.  Gibson did
not appeal further.  Gibson also filled out an Unacceptable Correspondence Form on
August 19, 2005.

### (11)   Charles Poulson

On August 12, 2005, Poulson filed a grievance (Grievance No. 126877) regarding
the August search.  On August 22, 2005, the Deputy Superintendent denied the grievance
giving the same reasons as in the August 10, 2005 Memorandum.  On October 9, 2005,
Poulson appealed the denial.  The Superintendent denied this appeal as untimely on
October 12, 2005 because appeals must be submitted within ten days.  On November 7,
2005, Poulson submitted an appeal to the Office of Grievances and Appeals.  On
November 15, 2005, the Office rejected the appeal because it did not include copies of the
appeal to the Superintendent and the Superintendent's response.  The Office gave Poulson
ten working days to provide the documentation but Poulson did not send it.  Poulson also
filled out an Unacceptable Correspondence Form on August 18, 2005.

### (12)   Sylvester Perry

On August 12, 2005, Perry submitted a grievance (Grievance No. 126709) regarding the August search.  On August 17, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  Perry did not appeal to the Superintendent.  On November 5, 2005, Perry submitted a document titled "Final Appeal/Grievance No. 126709" to the Office of Grievances and Appeals.  Perry stated that his appeal is late because the copy machine is not functioning and he had no way of making copies.  Perry also asserted that he was never informed that the investigation was complete and he was waiting for the outcome of this investigation to appeal.  On November 15, 2005, the Office of Grievances and Appeals wrote to Perry to inform him that it would not consider his appeal because he had not appealed to the Superintendent.

### (13)   Sean Williams

Williams did not submit any grievance regarding the August 4, 2005 search.

### (14)   Salim Hickman

On August 8, 2005, Hickman filed a grievance (Grievance No. 126003) related to the August search.  On August 15, 2005, the Deputy Superintendent denied the grievance giving the same reasons as in the August 10, 2005 Memorandum.  Hickman did not pursue this grievance further.  On August 17, 2005, Hickman also submitted the Unacceptable Correspondence Form.

On November 9, 2005, Hickman submitted another grievance (Grievance No.

-21-

135347).  Hickman grieved that he met with Moyer to review the seized documents.

Moyer returned some documents but said that other UCC related documents would not be

returned or sent home.  Hickman also complained in his grievance that some of the items

were missing.  On November 22, 2005, the grievance officer denied Hickman's grievance

and emphasized that UCC related items would not be returned.  The officer stated that

there was no evidence to substantiate Hickman's allegation of missing property.

Hickman did not appeal this decision.

### F.    Procedural History

On September 15, 2005, plaintiffs filed a motion to proceed *in forma pauperis*.  On

October 17, 2005, plaintiffs filed suit against forty defendants, who are all employees of

the DOC.  Jeffrey Beard is the Secretary of Corrections and initiated and approved the

searches and seizures.  Michael Lorenzo is the Deputy Superintendent for Security and

approved and orchestrated the searches and seizures.  Thomas Dohman is the Security

Captain and took part in the searches and seizures.  John Moyer is a lieutenant at SCI-

Graterford and took part in the searches and seizures.  Defendants Radle, Knauer, Owens,

and Grunder were lieutenants in the Graterford Security Office and approved, aided and

abetted the searches and seizures.  The following defendants approved and permitted the

searches and seizures: Donald Vaugh, Regional Deputy Secretary; David DiGuglielmo,

Graterford Superintendent; John Murray, Graterford Deputy Superintendent of

Operations; Thomas Buzzar, Major at Graterford; Francis Field, Major at Graterford.

Housing Unit Managers Jeffrey Baker, Sylvia Pallot, Sharon Luquis, and Eric Jones also approved and allowed the searches and seizures.  Defendants also include: Executive Deputy Secretary Shaffer, Scott Pasquale, Corrections Officer ("CO") Hariston, Lieutenant Scott Bowman, CO J.r. Andalora, Sergeant Vojacek, CO Strong, Co N. Hall, CO N. Hollis, Sergeant Hale, CO Reese, CO Short, CO A. Campbell, CO LeBlanc, Lieutenant A. Flaims, CO McMichael, CO D.M. Weaver, Lieutenant Lapinski, CO Stokes, Co Ulkowski, and unknown accomplices.  Plaintiffs also filed suit against three individuals who did not participate in the search: Chief Librarian Linda Miller, Mailroom Supervisor Kim Ulisny, and Misconduct Hearing Examiner Mary Canino.

On December 20, 2005, the court ordered the Clerk of Court to appoint counsel for the plaintiffs from the Prisoner Civil Rights Panel.  On January 4, 2006, the court stayed proceedings pending the appointment of counsel.  The attempts to appoint counsel were unsuccessful and the plaintiffs proceeded *pro se*.  Magistrate Judge Thomas Rueter held a settlement conference on September 8, 2006 at SCI-Graterford.  The parties were unable to resolve this dispute at the conference.  On September 15, 2006, the court lifted the stay and issued a scheduling order.  Defendants filed a motion to dismiss on October 6, 2006. On October 30, 2006, the court granted leave for the plaintiffs to file the first amended complaint, which they filed on November 24, 2006.  On December 7, 2006, the court permitted the plaintiffs to file a second amended complaint.  On December 29, 2006, defendants filed an amended motion to dismiss.  Plaintiffs replied on January 22, 2007.

On March 7, 2007, the court granted the motion to dismiss in part.  The court denied the motion as to plaintiffs' First Amendment and Fourteenth Amendment Due Process claim but dismissed plaintiffs' Fourth and Eighth Amendments, access to courts,[9] commerce clause, separation of powers, and compensatory damages claims.  Both parties have moved for summary judgment and these motions are now before the court.

## II.   STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party initially bears the burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  A fact is "material" only when it could affect the result of the lawsuit under the applicable law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party."  Id.  The moving party must establish

---

[9] Plaintiffs continue to assert access to courts claims in their motion and response to defendants' motion for summary judgment.  This claim has already been dismissed by the court.  Further, plaintiffs' allegations still do not meet the requirements for a valid access to courts claim outlined by the Court in Christopher v. Harbury, 536 U.S. 402 (2002) or Lewis v. Casey, 518 U.S. 343 (1996).  Additionally, defendants have afforded plaintiffs three opportunities to review their legal materials and take back non-UCC and redemption theory items.  Most plaintiffs have obstinately refused this offer.

that there is no triable issue of fact as to all of the elements of any issue on which the moving party bears the burden of proof at trial.  See In re Bessman, 327 F.3d 229, 237-38 (3d Cir. 2003) (citations omitted).

After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e); see also Williams v. West Chester, 891 F.2d 458, 464 (3d Cir. 1989).  A motion for summary judgment looks beyond the pleadings and factual specificity is required of the party opposing the motion. Celotex, 477 U.S. at 322-23.  The non-moving party may not merely restate allegations made in its pleadings or rely upon "self-serving conclusions, unsupported by specific facts in the record."  Id.  Rather, the non-moving party must support each essential element of its claim with specific evidence from the record.  See id.

A district court analyzing a motion for summary judgment "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in favor of that party.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted).  The standards governing cross-motions for summary judgment are the same, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. Grove v. City of York, 342 F. Supp.2d 291, 299 (M.D. Pa. 2004).  Summary judgment is therefore appropriate when the court determines that there is no genuine issue of material

fact after viewing all reasonable inferences in favor of the non-moving party.  See

Celotex, 477 U.S. at 322.

## III.    DISCUSSION

"[T]he Constitution sometimes permits greater restriction of such rights in a prison

than it would allow elsewhere."  Beard v. Banks, 126 S.Ct. 2572, 2577-78 (U.S. 2006);

see also Overton v. Bazzetta, 539 U.S. 126, 131 (2003); Shaw v. Murphy, 532 U.S. 223,

228-29 (2001); Bell v. Wolfish, 441 U.S. 520, 545-48 (1979).  "[P]rison regulations are

permissible if they are reasonably related to legitimate penological interests and are not an

exaggerated response."  Beard, 126 S. Ct. at 2578. Plaintiffs' constitutional rights are

limited in light of their convictions and incarceration at a state correctional facility.

However, Section 1983[10] provides a remedy when a constitutionally protected right has

been violated under the color of state law.  Oklahoma City v. Tuttle, 471 U.S. 808, 816

(1985).  To bring a successful claim under 42 U.S.C. § 1983, a plaintiff must

demonstrate: (1) the violation of a right secured by the Constitution, and (2) that the

constitutional deprivation was committed by a person acting under the color of state

---

[10] Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.

law.[11]  West v. Atkins, 487 U.S. 42, 48 (1988).

## A.        Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust a correctional facility's administrative remedies before he can initiate a Section 1983 action in federal court challenging conditions at the facility.  The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983) or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available have been exhausted." 42 U.S.C. § 1997e(a).

The Supreme Court has recently affirmed that '[t]he is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, Nos. 05-7058 and 05-7142, 127 S.Ct. 910, 918-19 (U.S. Jan. 22, 2007). "Compliance with prison grievance procedures...is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Id. at 922-923.  In other words, the prison grievance procedure supplies the "yardstick" to determine whether an inmate has exhausted administrative remedies.

---

[11] Although plaintiffs' do not frame their complaint in terms of Section 1983, the court will construe their complaint as doing so.  Although defendants concede that they are state actors, they argue that plaintiffs have not been deprived of their constitutional rights.

Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004). The availability of administrative remedies is a question of law.  Brown v. Croak, 312 F.3d 109, 113 (3d Cir. 2002). Failure to exhaust administrative remedies is an affirmative defense to be pled and proven by the defendant.  Jones, 127 S.Ct. at 921, Brown, 312 F.3d at 113.

The Third Circuit has noted that the PLRA qualifies the exhaustion of administrative remedies with the phrase "as are available," which implies that a prisoner cannot be expected to exhaust administrative remedies that are not available.  Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000).  Where no administrative remedies are available, a prisoner is relieved from satisfying Section 1997e(a) of the PLRA.  Id. Applying this rule, the Third Circuit determined that a plaintiff who averred that prison officials told him to wait to file a grievance until they investigated the incident plaintiff complained about had not failed to exhausted administrative remedies.  Brown, 312 F.3d at 113.  The Third Circuit concluded that "[a]ssuming security officials told [plaintiff] to wait for the termination of the investigation before commencing a formal claim, and assuming the defendants never informed [plaintiff] that the investigation was completed, the formal grievance proceeding required by DC-ADM 804 was never 'available' to [plaintiff] within the meaning of 42 U.S.C. § 1997e."  Id.

In order to bring a civil action, plaintiffs must have exhausted their administrative remedies under the PLRA prior to bringing suit on October 17, 2005.  Inmates at SCI-Graterford must comply with the requirements of DC-ADM 804, which establishes policy

for reviewing inmate grievances.  See Defs' Mot. Dismiss, Ex. 1.  DC-ADM 804 requires

that inmates complete a three level review process.  First, the facility grievance

coordinator completes an initial review.  Id. at VI.B.  Next, after receiving an initial

decision from the grievance officer, inmates can appeal to the facility manager within ten

days.  Id. at VI.C.  Finally, after receiving the decision from the appeal to the facility

manager, inmates can submit an appeal to the Office of Inmate Grievances and Appeals

within fifteen days.  Id. at VI.D.  DC-ADM 804 also requires plaintiffs to "identify any

person(s) who may have information that could be helpful in resolving the grievance" and

"include information on attempts to resolve the matter informally".[12] Id. at VI.A.7.

Defendants argue that plaintiffs are precluded from bringing this suit because none

of them exhausted the grievance procedure before filing the lawsuit.[13]  Only plaintiff

Royster submitted a timely grievance, appealed its denial to the Deputy Superintendent,

and submitted a final appeal to the Office of Grievances and Appeals, which upheld the

previous denial.  However, even Royster failed to exhaust remedies before filing suit.

---

[12] Defendants argue that the court must dismiss all defendant who plaintiff did not identify in grievance proceeding.  The Supreme Court's opinion in Jones viewed such a "name all defendants" rule in disfavor.  127 S.Ct. at 922.  The Court stressed that the PLRA does not impose such a requirement and that the prison policy at issue in the case only required that prisoners "be as specific as possible" in their grievances.  Id.  Defendants contend that DC-ADM 804 requires inmates to identify the staff members involved.  However, the policy only states that inmates must identify people who may have information helpful in resolving the grievance.  Moreover, the Third Circuit has held that since the purpose of the PLRA is to put prison officials on notice of plaintiff's claims, the prison can excuse an inmate's failure to identify people in his grievance if the omitted individuals "were fairly within the compass of the prisoner's grievance."  Spruill, 372 F.3d at 234.

[13] Plaintiffs argue in response that they have exhausted administrative remedies because they submitted additional documents.  Plaintiffs, however, do not submit these documents with their motion.  Therefore, the court can only rule based on the material in the record.

Plaintiffs respond that they relied on the representations in the August 10th Memorandum, which directed plaintiffs to object to the search using the Unacceptable Correspondence Form.  The Memorandum advised plaintiffs that the DOC's Chief Counsel Office would review this information and that plaintiffs could file a grievance when the office completed its investigation.  The Memorandum also states that plaintiffs will be advised of the outcome of its investigation.  While some plaintiffs did file grievances, collectively, plaintiffs argue that they are not barred from bringing suit by the PLRA because they relied on the representations in the August 10th Memorandum in deciding not to file grievances right away or at all.  The grievances from Johnson, Gibson, and Perry note that they are awaiting the result of an investigation.  Plaintiffs were never informed that the investigation was completed.

Defendants agreed that the Memorandum does say that the Chief Counsel will review objections and inform plaintiffs of his decision, at which point in time plaintiffs can file a grievance.  Defendants view this process as providing plaintiffs with an opportunity to file a second grievance but that under DOC policies, plaintiffs were still required to file a grievance and exhaust appeals.  Viewing all inferences in favor of the plaintiffs, it is conceivable that plaintiffs would think they had to wait until the investigation described in the August 10th memorandum had concluded before they could file grievances.  This case is also similar to Brown, when the Third Circuit stated that a plaintiff who had been told by prison officials to wait until an investigation was complete

before filing a grievance had not failed to exhaust remedies because officials never

informed plaintiff that the investigation was over.  I find that plaintiffs are not barred

from suit because the formal grievance procedure was not available to plaintiffs within

the meaning of 42 U.S.C. § 1997e.

## B.     Fourteenth Amendment Procedural Due Process Claim

"Due process is flexible and calls for such procedural protections as the particular

situation demands."  Mathews v. Eldridge, 424 U.S. 319, 334 (1976).  Incarceration and a

prison's interest in maintaining security limit a prisoner's due process rights.  Hewitt v.

Helms, 459 U.S. 460, 472 (1983).  This is particularly true when a prison must act quickly

to preserve security and thwart inmates from disposing of contraband.  Hudson, 468 U.S.

at 529 (finding that "wholly random searches are essential to the effective security of

penal institutions"); Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 421 (3d Cir.

2000).  When a prison seizes an inmates's property, the prisoner receives constitutionally

sufficient due process if he has an adequate post-seizure remedy.  Hudson v. Palmer, 468

U.S. 517, 533 (1984); Parratt v. Taylor, 451 U.S. 527, 540-541 (1981) (finding that an

inmate had no due process right to pre-deprivation notice).  The Third Circuit has

established that "the Pennsylvania Department of Corrections' grievance procedure

provides an adequate post-deprivation remedy."  Durham v. Dep't of Corr., 173 Fed.

Appx. 154, 157 (3d Cir. 2006) (citing Tillman, 221 F.3d at410, 422 (3d Cir. 2000)).

Plaintiffs' procedural due process claims survived the motion to dismiss because

-31-

plaintiffs pled that the prison did not follow its internal grievance procedure.  In opposing the motion for summary judgment, plaintiffs now bear the burden of showing that they lacked a sufficient opportunity to be heard regarding the deprivation of their property.

First, plaintiffs argue that they were denied due process because the search and confiscation of their legal materials precluded their ability to litigate.  The court has already foreclosed this argument by dismissing plaintiff's access to courts claim.

Second, plaintiffs seem to be arguing that defendants were required to give pre-deprivation notice prior to the August search.  This is incorrect as a matter of law.  Under Hudson and Parratt, defendants were only obligated to provide post-deprivation notice and an opportunity to be heard through DC-ADM 804 grievance procedure.  Only one plaintiff followed the three-level appeals process dictated by DC-ADM 804.  Other plaintiffs allege that they were unable to exhaust the grievance procedure because defendants lost the grievances and appeals that they filed.  This does not create an issue of fact because it is undisputed that defendants afforded plaintiffs three additional opportunities to review the seized material even though plaintiffs had not exhausted the grievance procedure.  In October and November of 2005, Moyer met with plaintiffs and offered to let them review all of the seized materials.  He also offered to return seized material to Belser, Collins, Dickerson, Everett, Gibson, Green, Hickman, Monroe, Perry, Poulson, and Willims; only Perry and Hickman accepted the offer.  In August 2006, Moyer again offered to let all the plaintiffs review their materials and return non-

contraband items to them.  All of the inmates refused to take back the materials offered to

them; Belser, Collins, Davis, Dickerson, Everett, Gibson, Perry, Poulson, and Stover also

refused to review the materials.  In September and October 2006, defendants complied

with the court's order and permitted Belser, Collins, Davis, Dickerson, Everett, Gibson,

Perry, Poulson, Stover, Green, and Williams to review and receive some of their materials

back.  Dickerson and Everett refused to review the material.  Green was the only plaintiff

who agreed to took back the offered materials.  These three additional opportunities to

review the seized material and the offers to return non-contraband items to the plaintiffs

remedy any due process defects plaintiffs may have experienced while pursuing

grievances under DC-ADM 804.

Third, plaintiffs allege that they have been denied due process because defendants

purposely destroyed their materials after seizing them.  Plaintiffs state that they were

informed by correctional officers that defendants were shredding, throwing away, or

distributing their personal material among prison staff.  Plaintiffs do not identify these

employees or submit affidavits from them in their motion and also refused to identify

them when asked by defendants through interrogatories.  In support of their motion for

summary judgment, defendants have submitted sworn affidavits that all of the material

seized from plaintiffs cells has been safely and securely stored in the prison since that

date and none has been destroyed, discarded, or damaged.

To resist summary judgment on their due process claims, plaintiffs cannot "rest

upon the mere allegations or denials of the adverse party's pleading" but must through

affidavits, depositions, admissions, or answers to interrogatories "set forth specific facts

showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Moreover,

affidavits opposing a motion for summary judgment must be based on personal

knowledge and establish facts that would be admissible at trial.  Hlinka v. Bethlehem

Steel Corp., 863 F.2d 279, 281-282 (3d Cir. 1988).  While a court must be more lenient in

construing the pleadings of *pro se* petitioners, plaintiffs fail to meet their burden under

Rule 56.  A court can disregard the technical deficiencies of a *pro se* litigant and treat the

factual assertions in a brief as an affidavit if the document is notarized.  Hurd v. Williams,

755 F.2d 306, 308 (3d Cir. 1985).  Plaintiffs' cross-motion for summary judgment is not

notarized.  Even if it were, it would still be insufficient to support plaintiff's motion

because it does not constitute admissible evidence.  When a plaintiff's allegations are

opinion and not fact, they fail to create a genuine issue of material fact.  Id.  Here,

plaintiffs' allegations that they were informed by corrections officers that defendants had

destroyed their personal material are hearsay.  Without affidavits from the corrections

officers or other individuals with first hand knowledge, plaintiffs' pleadings are

insufficient to withstand summary judgment.

Fourth, plaintiffs argue that defendants did not follow DC-ADM 804 procedures

for disposing of material, which state:

> Personal property and publications related to a grievance shall not be disposed of
> unless it is clearly document (sic) that the inmate has no intent to appeal the Initial

> Review decision....Following the disposal of the appeal by the Secretary's Office
> of Inmate Grievances and Appeals, the inmate will be provided with his/her
> options to retain, ship at his/her expense or have the property or publication
> destroyed.

Defs' Mot. Dismiss, Ex. 1, DC-ADM 804 VI.C.2.e.  Defendants have not permitted

plaintiffs to ship, at their own expense, the contraband materials seized outside of the

prison in accordance with this policy.  I will order defendants to do so.

Finally, plaintiffs also suggest defendants violated their due process rights because

plaintiffs used their own funds to purchase the materials seized by defendants.  To

support their argument, plaintiffs analogize to caselaw finding that inmates are entitled to

due process for funds held in prisoner accounts.  See Reynolds v. Wagner, 128 F.3d 166,

179 (3d Cir. 1997) (finding that inmates have a property interest in funds held in prison

accounts but that the prison's procedures for deducting medical fees from prisoner

accounts provided due process).  Plaintiffs' have no special entitlement to keep these

commercial law materials or to be reimbursed because they paid for them.

I will grant summary judgment for defendants on plaintiffs' due process claims.

Even if plaintiffs had difficulties utilizing the grievance procedure, plaintiffs had a

constitutionally sufficient post-seizure remedy to review their materials and to receive

some of their materials back.  However, I will order that defendants permit plaintiffs to

ship seized material out of the prison and to give plaintiffs one more opportunity to

review their material and to take back  non-contraband items.

C.    **First Amendment Claim**

The First Amendment right to free speech is not absolute inside or outside prison walls.  The First Amendment does not protect speech likely to incite immediate lawless action or breaches of the peace.  Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) ("the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").  In the prison context, the Court has upheld a regulation prohibiting group meetings and organizational activities for a prison union because prison administrators concluded that the objectives of the union, which focused on an adversary relationship with institution personal, would be detrimental to order and security in the prisons.  Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 132-133 (1977).  The Court has also established that prisons can regulate publications that facilitate criminal activity for security reasons.  Thornburgh v. Abbott, 490 U.S. 401, 415 (1989).

Plaintiffs claim that they have a First Amendment right to possess and utilize the UCC and other commercial law materials "to seek redress of any grievances they have to business transactions or property disputes."  Pls' Mot. Summ. J. ¶ 185.  Plaintiffs view the DOC as operating a "captive inmate market" by selling inmates various goods and services.  Plaintiffs assert that they enjoy consumer protection rights as customers of the DOC.  Defendants' counter that the First Amendment does not give plaintiffs' the right to possess this material because it is dangerous to prison staff and the public at large.  Since

plaintiffs' relationship with the DOC is not commercial in nature, plaintiffs have no legitimate need for this material. Moreover, redemption theory materials are not deserving of First Amendment protection because they advocate anti-government action and undermine the DOC's authority.

To analyze plaintiffs' First Amendment claim, the court must apply the test developed by the Supreme Court in Turner v. Safley, 482 U.S. 78 (1987) to determine "whether a prison regulation is reasonably related to legitimate penological interest" and is not an "exaggerated response." Beard, 126 S.Ct. at 2578 (citation omitted). This test allows courts to strike the "appropriate balance between prisoners' exercise of their constitutional rights and the institutional needs of prison administrators." Ramirez, 379 F.3d at 126. The Third Circuit instructs courts to conduct a two-step Turner analysis:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational or to demonstrate that it represents an exaggerated response to the asserted objectives. [Second] If such a rational relationship is found to exist, that determination commences rather than concludes our inquiry. The other three Turner factors to be considered are (1) whether inmates retain alternative means of exercising the circumscribed right, (2) the burden on prison resources that would be imposed by accommodating the right, and (3) whether there are alternatives to the regulation that fully accommodate the prisoners' rights at de minimis cost to valid penological interests."

Jones, 461 F.3d at 360 (citations omitted). Challengers of the regulation have the ultimate burden of persuasion that the policy is unreasonable and fails step one of the Turner analysis. Id. The defenders of the policy must provide a government interest to

justify the regulation and to "demonstrate that the policy drafters could rationally have seen a connection between the policy and that interest." Id.  In applying the Turner test, the court must exercise "substantial deference to the professional judgment of prison administrators."  Beard, 126 S. Ct. at 2578 (citing Overton, 539 U.S. at 132). The Turner test is fact-intensive and the Third Circuit has held that it requires "a contextual, record-sensitive analysis." Ramirez, 379 F.3d at 128, 130.

      **(1)    Rational Relationship**

Defendants argue that August 4th search and seizure was necessary to maintain the safety and security of DOC facilities, DOC staff and public officials, and the public at large because it prevented plaintiffs from filing fraudulent liens and other forms of commercial harassment by removing "how to" guides.  It is well established that safety and internal security is a legitimate goal for prison administrators.  Overton, 539 U.S. at 133; Thornburgh, 490 U.S. at 415; Hewitt, 459 U.S. at 473; Turner, 482 U.S. at 78, 86, 87, 92.  Defendants also advocate that their actions are justified by society's interest in deterring convicts from future crimes.  Their actions advanced this government interest by cutting off access to publications that encouraged inmates to undermine legitimate government authority by challenging their sentences and the prison's power over them.

The Supreme Court has instructed that in conducting a deferential review of the judgment of a prison officials' rationale, a court cannot place too high an evidentiary burden on a prison administrator.  Beard, 126 S. Ct. at 2581.  In support of their motion,

defendants cite to fifteen criminal prosecutions for redemption theory, copyright, and other schemes misusing commercial law going back to 1994.  See Defs' Am. Mot. Dismiss, App. IV.  In mid-2004, Fairall, the DOC's Deputy Chief Counsel, became aware of a scheme in New Jersey where criminal defendants had filed bogus liens against a federal prosecutor and judge to intimidate and harass.  Upon investigation, Fairall learned that while it was easy to file a lien it was expensive and difficult to expunge the fraudulent statement and the damage to the individual's credit report caused by the lien was difficult to correct.

While the DOC was educating itself on the threat these schemes posed, staff at SCI-Graterford learned that inmates incarcerated at Graterford possessed the same "how to" guides that the New Jersey defendants used to file fraudulent liens.  Materials like Cracking the Code and The American's Bulletin instructed inmates that the government only had power over their "strawmen" or fictional selves.  In order to "redeem" the fictional self, receive millions of dollars, and be released from custody, the real person must file a financing statement.  This threat was realized in March 2005 when a DOC inmate filed a UCC financing statement against defendant Beard and a prison superintendent.  In September 2005, the inmate threatened to file additional liens unless the DOC released him from prison.  The inmate predicted that hundreds of inmates would soon be filing liens.

Based on this experience, the DOC changed its policies to prevent inmates from

receiving certain redemption theory materials as being in violation of the prison's policy that prohibits writings that advocate or assist criminal activity.  Before the policy went into effect, the prison, which had been monitoring which inmates received commercial law and redemption materials in the mail since June 2004, decided to search the cells of inmates who received these materials and seize them.

Plaintiffs bear the burden of showing that defendants' decision to search their cells and seize legal materials was irrational.  They fail to meet this burden.  Plaintiffs argue that the policy is not rational because these materials have been in Pennsylvania prisons for twenty-seven years and only one prisoner has filed liens.  Plaintiffs maintain that the DOC's search and seizure of UCC materials and its decision to prohibit them is, therefore, an overreaction.  Plaintiffs also argue that since they have not filed fraudulent liens, defendants had no reason to search their cells and seize their materials.  Plaintiffs' contend that the behavior of other inmates is irrelevant because DOC policy prohibits inmates from communicating with one another without prior permission.  The other DOC inmate who filed a lien against defendant Beard is not incarcerated at SCI-Graterford with the plaintiffs.

The Supreme Court has stated that prevention of future criminal behavior is a legitimate government interest.  Prison administrators are entitled to rely on predictions of future behavior in formulating policy.  Hewitt, 459 U.S. at 474; see also North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132-33 (1977) (finding that inmates' First

Amendment free association rights can be limited when prison officials conclude, in their

discretion, that certain activities "possess the likelihood of disruption to prison order or

stability."). Even though plaintiffs have not filed liens, the search and seizure revealed

that plaintiffs possessed materials that the DOC labeled contraband through its September

2005 amendment to DC-ADM 803. Plaintiffs possessed Cracking the Code, partially

completed financing statements, and redemption theory books.[14] In their pleadings,

---

[14] See Defs' Mot. Summ. J. App. V, Third Moyer Decl. Ex. D. for a list of items seized from plaintiffs in August 2005. While too numerous to list here, these lists show plaintiffs possessed a substantial amount of materials that would enable them to file fraudulent liens. Plaintiffs do not deny that the material was theirs. Belser had The American's Bulletin publication entitled One Man Out, instructions and forms for filing out security agreements and UCC financing statements, copyright instructions, a booklet on the private commercial lien process, and notes on obtaining counterfeit documents. Collins possessed articles from The American's Bulletin, a commercial security agreement for himself, redemption theory booklets, articles entitled "UCC Connection Free Yourself from Legal Tyranny," "How to File a Tort Claim Against a Public Entity," "The Private Commercial (Lien) Process;" Cracking the Code, copy of UCC financing statement and instructions for UCC Financing Statement. Davis possessed UCC financing statements, a booklet entitled "Blue Book of the S.E.A. RE: The Right of the Associate of Sovereigns of Earth of Particular Standing Constituting an Alliance for Self-Government," a copyright notice on the trademark "Jay Griffin" and a commercial notice that any party who uses this name will be billed $500,000 for each count. Dickerson possessed a "power of attorney from Anthony Dickerson, Straw Man to Anthony Dickerson, copies of UCC financing statement, an envelope containing a letter of demand addressed to Jeffrey A. Beard and a form security agreement, and a booklet entitled "Redemption-the Road to Freedom." Everett possessed Cracking the Code, instructions and forms for filing commercial liens, and a booklet entitled "Redemption, the Cold, Hard Facts." Gibson possessed Cracking the Code, a booklet entitled "Redemption, the Cold, Hard Facts," The American's Bulletin, and instructions on filing UCC financing statements. Green possessed handwritten notes from Cracking the Code, UCC financing statements, and an article entitled "The Emerald City aka The Wizard of Oz deals with issues on the 'Strawman'". Hickman possessed a financing statement showing Salim Dwight Hickman as debtor and Salim Dwight Hickman as secured party, copy of UCC financing statement, and a page of an article titled "Sample UCC-4 Private Security Agreement Against IRS District Director." Johnson possessed UCC financing statements, two redemption manuals, issues of The American's Bulletin, and Cracking the Code. Monroe possessed Cracking the Code, forms and instructions for filing UCC Financing Statements, draft of security agreement showing Edward Monroe as debtor and secured party, and The Blue Book of the Sovereign Earth Alliance. Perry possessed UCC financing statements, articles including "The UCC Connection: Free Yourself from Legal Tyranny" and "What/Who is the Straw Man," and pamphlet's from The American's Bulletin. Poulson possessed a security agreement between Charles William Poulson, Jr. and Charles William Poulson, Jr., UCC financing statement with copyright notice attached, articles entitled "The UCC Connection: Free Yourself from Legal Tyranny" and "Before the Judge, Understanding How to Handle and Discharge the Commercial Criminal Charges," and booklet entitled "Redemption: The Complete Manual with Forms and Procedure." Royster possessed booklets entitled "One Man Out: The Redemption Process Formulated for Those Incarcerated," "Redemption Manual: From Debtor Slave on the Plantation to Secured Party Creditor," and "How to Stop Paying Social Security and Get a Refund." Stover possessed a copyright notice and security agreement and a UCC financing statement partially completed showing Gregory Stover as the debtor. Williams possessed Cracking the Code, issues of The American's Bulletin, copyright notice instructions, UCC financing statements.

plaintiffs describe themselves using the language of redemption theory and claim that they are imprisoned for debts and not the commission of crimes.[15]  Some claim to hold copyrights in their names.  Others have filed UCC financing statements against themselves as part of the redemption process.   On May 8, 2006, the plaintiffs were named in an "intentional tort claim"against state officials alleging unlawful detainment and discrimination filed on their behalf.  See Defs' Mot. Summ. J., App. II, Fairall Decl., Ex. D.  Even if plaintiffs had not yet filed liens, defendants, well aware that redemption theory had infiltrated the Pennsylvania prisons, accurately predicted plaintiffs had all the tools necessary to do so.  Under these circumstances, defendants' decision to seize commercial law material was rationally related to a legitimate governmental interest.

### (2)      Alternative Means for Plaintiffs to Exercise Right

To determine whether there are adequate alternative means of exercising the right, the Court has instructed that "'the right' in question must be viewed sensibly and expansively."  Thornburgh, 490 U.S. at 418.  The focus remains whether there are alternative means of expression.  Id.  In Thornburgh, the Court had to determine the constitutionality of a prison regulation that permitted the warden to reject incoming publications that described the construction or use of weapons, methods of escape, procedures for making alcoholic beverages or drugs, items written in code, depictions of

---

[15] In their initial complaint, plaintiffs state that they are "self-realized entities" who "are currently housed, logged and indexed as goods and/or wares" and refer to their "straw party" appellations.  Compl. p. 3. Plaintiffs assert that "all crimes are commercial in nature" and that they therefore need the UCC in the criminal court process. Am. Compl. p. 19.  They state that their sentences are actually debt and that they are being held as surety for the bond.  Id.

"activities which may lead to the use of physical violence or group disruption," instruction on the commission of criminal activities, or sexually explicit material.  Id. at 405.  The Court concluded that this regulation passed the second step of the Turner test because the policy still permitted "a broad range of publications to be sent, received, and read....".  Id. at 418.

In addition to broadly construing the right at issue, the Court has also dictated that "[a]lternatives...need not be ideal, however; they need only be available."  Overton, 539 U.S. at 135.  Recently, in Banks, the Court found that a policy that prohibited one group of inmates with severe behavioral problems from receiving any newspapers or magazines was not per se unreasonable even if there was no alternative means for prisoners to exercise this aspect of their First Amendment right.  126 S.Ct. at 2579-80.

Defendants correctly note that its decision to seize and prohibit possession of commercial law materials leaves plaintiffs adequate alternatives to possess and read a wide variety of other political, economic, philosophical, and legal materials. Furthermore, since all inmates are prohibited from engaging in business or commerce while incarcerated, plaintiffs have no legitimate need to possess commercial law material. Plaintiffs respond that the DOC's decision to label these commercial law materials as contraband leaves them without adequate alternatives.  Plaintiffs argue that they have a First Amendment right to access and possess UCC materials because PA DOC is a 'market participant' in the 'captive inmate market' and sells inmates goods and services

including cosmetics, clothing, appliances, telephone time, photocopies, and cable television services.  From this strained logic, the plaintiffs conclude that the PA DOC is a 'vender' and its business transactions with the plaintiffs are governed by the UCC.

Plaintiffs' position is nonsensical.  They do not have a buyer-seller relationship with the DOC.  They have been convicted in Pennsylvania courts and sentenced to a period of incarceration.  If they have complaints about the goods and services the DOC provides, plaintiffs can utilize the DOC's internal grievance procedure; access to the UCC will not assist them.

As to plaintiffs' contention that they have a First Amendment right to use and possess commercial law materials, other courts have held that inmates do not have a First Amendment right to possess this material.  While these decisions are not binding on this court, they are persuasive.  The district court of Oregon affirmed an Oregon Department of Corrections mail policy regulating materials that threatened prison safety and security. Ray v. Williams, No. 04-863, 2005 WL 697041 (D. Or. Mar. 24, 2005).  This policy prevented an inmate from receiving Cracking the Code and the court found that it was rationally related to a legitimate penological interest under Turner and therefore not in violation of petitioner's First Amendment rights.  Id.  The Ninth Circuit affirmed this decision in a non-precedential opinion.  Ray v. Williams, No. 05-35688, 2007 U.S. App. LEXIS 14167 (9th Cir. June 5, 2007).  The Pennsylvania Commonwealth Court upheld the validity of the amendment to DC-ADM 803, the DOC's incoming mail policy, that

-44-

prohibited UCC related material.  <u>Bundy v. Beard</u>, 2007 WL 1468726 (Pa. Cmwlth Ct.

May 22, 2007).  The court held that there was a rational connection between the policy

and the prison's interest in curtailing the filing of bogus liens.  <u>Id</u>. at *4.

### (3)     Burden on Prison to Accommodate Right

The Supreme Court requires deference to the judgment of prison administrators

where "....the right in question can be exercised only at the cost of significantly less

liberty and safety for everyone else, guards and other prisoners alike...".  <u>Thornburgh</u>, 490

U.S. at 418; <u>see also</u> <u>Overton</u>, 539 U.S. at 135 (when accommodating prisoner's demands

"would cause a significant reallocation of the prison system's financial resources and

would impair the ability of corrections officers to protect all who are inside a prison's

walls," courts should be "'particularly deferential' to prison administrators' regulatory

judgments.").  Here, the burden of accommodating plaintiffs access to commercial law

materials would nullify any benefit the DOC is seeking to achieve by eliminating this

material from the prison.  The Pennsylvania Commonwealth Court has recognized–and

this court agrees--that "accommodation of any perceived right to UCC related materials in

these circumstances will only serve to encourage the filing of bogus claims, thereby

potentially burdening criminal justice employees with the hardship from false UCC

filings and distracting them from their duties." <u>Bundy</u>, 2007 WL 1468726, at *4.

### (4)     Alternatives to the Regulation

The final factor under the <u>Turner</u> test acts as a double-check because "[t]he

existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." Thornburgh, 490 U.S. at 418.  "Turner does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." Overton, 539 U.S. at 136.  Here, plaintiffs argue that instead of banning the material, the DOC should have announced this material was contraband and asked plaintiffs to turn it over or the DOC should have waited until an inmate filed a financing statement or lien before taking action.  It is unlikely that plaintiffs would have turned over the material if asked since their pleadings illustrate the sincerity of their belief in the redemption process.  Waiting until plaintiffs filed liens would place too heavy a burden on DOC staff and the public at large because removing a lien is a difficult and involved process.  This alternative is inappropriate under Turner because it imposes more than a de minimis cost.  Even though there is no evidence that any of the plaintiffs actually filed liens, the seized material shows that many had all the tools necessary to do so.  While these commercial law materials do not pose a physical threat to the safety and well-being of the public as traditional implements of contraband do, one court has noted that redemption theory materials are just as dangerous because they advocate criminal activity by "passing it off as a legitimate means of fiscal responsibility, [which] could contribute to the growth of an anti-authority attitude" in the prison.  Ray, 2005 WL 697041, at *7.

Defendants were justified in trying to preempt this harm.

I will grant summary judgment on plaintiffs' First Amendment claim.  Plaintiffs' have not met their burden under the <u>Turner</u> test of showing that there is a genuine issue of material fact concerning whether there is a the absence of a reasonable relationship between the search and seizure and a legitimate governmental interest.

### D.    Damage Claims

Having granted summary judgment to defendants', plaintiffs' damages claims are irrelevant.  Moreover, plaintiffs' claims for punitive and nominal damages are barred by the Eleventh Amendment to the Constitution, which immunizes state and state agencies from suits by private parties.  <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261 (1997).  The DOC is an administrative branch of the Commonwealth of Pennsylvania and therefore, is immune to suit under the Eleventh Amendment.  The Eleventh Amendment also immunizes individual defendants sued in their official capacity. <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985).

Section 1983, however, does not immunize state officials who are sued in their individual capacity.  For liability to attach, plaintiffs must allege personal involvement through particular allegations of participation, knowledge, or acquiescence.  <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988). Here, only Lorenzo, Moyer, and the searching officers were personally involved in the seizure of documents.  Captain Dohman, Moyer's supervisor, may have had knowledge or acquiesced to the seizures.

-47-

Deputy Secretary of Corrections, John S. Shaffer may have also had knowledge because he signed the memorandum stating that UCC and redemption materials were contraband. The other defendants lacked personal knowledge and involvement and therefore cannot be liable in their individual capacities.

Defendants who were personally involved in the search and seizure have qualified immunity from plaintiffs' damage claims. The Third Circuit uses a two-part test to determine whether qualified immunity is available as a defense. Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997). First, "the court must determine whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation." Id. If the plaintiff cannot show a constitutional violation, the analysis ends and the officer is granted immunity. If, however, there is a constitutional violation, the court must determine whether the constitutional right was clearly established. Id. In other words, the court must determine "in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?" Id. The officer is entitled to qualified immunity only if "it would not have been clear to a reasonable officer what the law required under the facts alleged...." Id. at 136-37. Here, plaintiffs have not proven a constitutional violation and therefore defendants are entitled to qualified immunity. Even if they had shown a constitutional violation, under the law at the time of the search, reasonable administrators would have believed they were acting lawfully to search and seize contraband and provide plaintiffs with post-seizure due process through

the grievance procedure.

**IV.     CONCLUSION**

For the reasons discussed above, I will grant defendants' motion for summary

judgment and deny plaintiffs' motion.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD MONROE, et al., | : | CIVIL ACTION |
|     Plaintiffs, | : | NO. 05-04937 |
| | : | |
|     v. | : | |
| | : | |
| JEFFREY A. BEARD, et al., | : | |
|     Defendants. | : | |

## ORDER

**AND NOW**, this 16th day of August, 2007, upon consideration of defendants'
motion for summary judgment (Document No. 150) and plaintiffs' motion for summary
judgement  (Document Nos. 162, 165) and the responses thereto, it is hereby **ORDERED**
that plaintiffs' motion is **DENIED** and defendants' motion is **GRANTED**.

It is further **ORDERED** that defendants shall provide all plaintiffs with one more
opportunity to review the materials that defendants seized from them and accept back the
non-contraband material.  Accepting this material will not prejudice plaintiffs' right to
appeal this decision.  Consistent with DOC policy DC-ADM 804 VI.C.2.e, defendants are
also **ORDERED** to permit plaintiffs to ship contraband material outside of the prison at
their own expense.

The Clerk of the Court is directed to mark this case closed for statistical purposes.

BY THE COURT:


 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.